## Wagner's Estate

48

*J. Willison Smith,* for exceptant.
*Charles J. Biddle,* contra.

LADNER, J., March 10, 1944.—Decedent, Louis M. Wagner, and claimant, Humbert R. Powell, executed a written agreement under seal dated June 28, 1917, which recited, in substance, that they together held 51 percent of the Hastings & McIntosh Truss Company's outstanding stock, and that each desired to continue in control of the company in the event of the other desiring to sell or dying. Each then gave to the other an option to purchase his stock. Paragraph 1 of the agreement covered the procedure where either party desired to

sell in his lifetime. Substantially the same procedure was agreed on in the case of death, as to which paragraph 2 provides as follows:

"2. In the event of the death of either party hereto, the survivor shall have the first right to purchase the said stock of the Estate of the deceased party, at a price to be agreed upon between the surviving party and the personal representatives of the deceased party. In the event of their not being able so to agree upon a price, the surviving party shall appoint one arbitrator and the personal representatives of the decedent shall appoint another arbitrator, and the two arbitrators shall appoint an umpire, and the decision of a majority as to the value of the stock, shall be binding upon the parties hereto their and each of their heirs, executors, administrators and assigns. In arriving at this decision, no good-will shall be considered."

The agreement also required notice by the survivor, within 60 days after the death of the other party, of the survivor's desire to purchase decedent's stock. The agreement by its express terms (paragraph 6) bound the heirs, executors, and assigns of both parties.

Mr. Wagner died December 26, 1937, and it is conceded that Mr. Powell gave the requisite notice to decedent's executor but at the audit of the first account, May 1, 1939, the matter of Mr. Powell's right to purchase the stock by mutual agreement was left open for the life of the widow so that she might receive the income from the stock. The question now before the court was accordingly not passed on by the then auditing judge (Bolger).

Upon the death of the widow, the present account was filed and Mr. Powell pressed his claim to purchase decedent's stock. The executors refused to agree on the price and refused to appoint an arbitrator, and claimed the agreement to fix price was one of arbitration in which the arbitrators were not named and hence rev-

ocable. The learned auditing judge so construed the contract after pointing out the Arbitration Act of April 25, 1927, P. L. 381, 5 PS §161, by section 19, 5 PS §179, excludes from its operation contracts made prior to the act's effective date. He then ruled that under prior law, when arbitrators were not named in an agreement to arbitrate, the agreement was revocable, citing Commercial Union Assurance Company of London v. Hocking, 115 Pa. 407, Henry v. Lehigh Valley Coal Co., 215 Pa. 448, and Needy v. German American Insurance Company of New York, 197 Pa. 460, etc., and dismissed Mr. Powell's claim. To this ruling an exception was taken which is before us for disposition.

If this contract may be properly construed as an agreement of arbitration, then the ruling of the learned auditing judge is correct. If, however, it is merely an agreement to fix price in a specified manner, the exception must be sustained. As neither counsel at the first argument argued this point, which we regard as controlling, we ordered reargument. The case was ably reargued and both counsel, and their excellent briefs, have been of much assistance in enabling us to dispose of the question.

Agreements providing for arbitration of future disputes and controversies, or by arbitrators not named but to be appointed thereafter in a manner specified, were regarded by the common-law courts as quasi-judicial proceedings. They were looked at with disfavor as encroaching upon the judicial prerogative, and were consequently held to be either invalid or revocable. In later years this hostility largely disappeared, no doubt from a realization of a change in public policy as evidenced by the enactment of arbitration acts such as our Act of 1927, which make valid and irrevocable contracts formerly held invalid or revocable. See Nippon, etc., v. Ewing-Thomas Corp., 313 Pa. 442, 448. But even long before this change of public policy, the courts generally recognized a basic and very sound dis-

tinction between contracts of arbitration and contracts providing a method of merely fixing price or value, the latter, called contracts of valuation or appraisement, being upheld as valid and irrevocable. In determining whether a given contract is a contract of arbitration or one of appraisement, the terminology used in the contract is not controlling, for the words "appraisement" and "arbitration" and "appraisers" or "arbitrators" are sometimes used interchangeably, and without any clear difference in meaning. It is the intention of the parties which determines whether a given contract is, in reality, one of arbitration or not.

Mr. Justice Linn, then of the Superior Court, in Grote v. Stein et ux., 99 Pa. Superior Ct. 556, in a learned opinion set forth the tests to be applied in distinguishing between the two in the following language (p. 559):

" 'In order to constitute a submission to arbitration there must be some difference or dispute, either existing or prospective, between the parties, and they must intend that it should be determined in a quasi-judicial manner. Therein lies the distinction between an agreement for a valuation and a submission to arbitration, for in the case of a valuation there is not, as a rule, any difference or dispute between the parties, and they intend that the valuer shall, without taking evidence or hearing argument, make his valuation according to his own skill, knowledge, and experience.'. . . In re Carus-Wilson & Green, L. R. 18 Q. B. D. 7, it appeared that in the sale of land one of the conditions was that the vendee should buy the timber on the land at a valuation, each party to appoint a valuer, the two to appoint an umpire. A valuation was made and the question was whether it was an award or an arbitration. The court of appeals held that it was an appraisement and not an arbitration. Lindley, L. J., said, 'In the ordinary cases of arbitration there is a dispute which is referred.

The object of the valuation, on the other hand, is to avoid disputes. There is nothing in the nature of a dispute when the valuer is appointed. It is a term of the agreement for sale that the timber shall be valued and that the purchaser shall take it at the valuation. It is a mere matter of fixing the price, not of settling a dispute.' "

See also The Green & Coates Streets Passenger Ry. Co. v. Moore et al., 64 Pa. 79, where the distinction between agreements of arbitration and agreements of appraisement was enlarged upon and Justice Sharswood pointed out that an appraisement is not subject to the strict rules governing arbitration and awards, citing Kelly v. Crawford, 5 Wall. 785.

In 5 C. J. 17, n. 12, it is said:

"[It may be said in general that arbitration] in the proper sense of the term presupposes a controversy or a difference to be tried and decided. Arbitrators generally proceed in a quasi-judicial manner to settle the dispute. Their jurisdiction is in the nature of a judicial inquiry, and certain rules of procedure must be observed or the award will be void. On the other hand, an appraisal is the proper term to be used when an appraisement or valuation is to be made as auxiliary or incident to a contract. The appraisers are selected to preclude or to prevent, by appraisal, the arising of differences, and not to settle differences which have already arisen. Unless there are some restrictions in the agreement under which they are appointed, appraisers are generally expected to act on their own knowledge and investigation, and hence are not required to give notice of hearings, hear evidence or receive the statements of parties."

See 8 Cornell L. Q. 53, where, in an excellent article, the many cases are gathered and commented upon.

Applying the test outlined above to the contract before us, it is clear that despite the use of the term "arbi-

trators" the contract here really provides for valuation or appraisement. Each party grants to the other an option termed in the contract the first right to purchase the other's stock, and provides a definite manner in which the price shall be fixed, first, if possible, by agreement of the parties or their personal representatives if dead, and, second, upon failure to agree, by appointment of three persons in the manner specified. There is a plain implication here (since the contract concerned closely-held stock not traded on the market) that what the parties meant by "value" was book value, for the contract expressly excludes goodwill.

Having determined that the contract before us is one of valuation or appraisement and not of arbitration, we next inquire whether the fact that specific arbitrators were not named in the contract renders it revocable in the manner that contracts of arbitration, without named arbitrators, were deemed revocable before 1927. Authorities are divided on this point. The weight of authority holds that contracts of appraisement or valuation will be upheld even though the appraisers are not named in the contract. Thus section 551, 2 A. L. I. Restatement of Contracts, subdiv. (3), states:

"A bargain in which the only measure of a promisor's duty is whatever valuers or arbitrators shall decide is not illegal unless its terms under the circumstances are unfair."

Comment 3, explaining the same, says:

"A promises to sell an automobile to B at whatever price valuers to be selected by them shall fix, and B promises to buy the machine at that price. The bargain is legal."

Other authorities, where contracts of valuation were upheld as irrevocable though the valuers or appraisers were not named in the contract, are: City of Omaha v. Omaha Water Co., 218 U. S. 180; In re Carus-Wilson and Greene, L. R. 18 Q. B. D. 7; Toledo S. S. Co. v. Zenith Transp. Co., 184 Fed. 391, 401; Sebree v. Board

of Education, 254 Ill. 438, 446; Matter of Fletcher, 237 N. Y. 440, 445 (where an agreement, such as here, to purchase stock at a valuation to be fixed by arbitrators to be named in the same manner as in the instant case was held to be enforcible) —all of which are cited by Judge Linn in Grote v. Stein et ux., 99 Pa. Superior Ct. 556, 560. To these may be added Luedinghaus Lumber Co. et al. v. Luedinghaus et al., 299 Fed. 111 (C. C. A. 9), Noble v. Grandin, 125 Mich. 383, Martin v. Vansant, 99 Wash. 106, Monidah Trust v. Arctic Const. Co., 264 Fed. 303, and Leonard v. Cox, 64 Mo. 32.

Nor are we altogether without authority in Pennsylvania, for Fitzsimmons v. Lindsay, 205 Pa. 79, would seem, inferentially at least, to decide the question in the same manner as the cases just cited. As in the instant case, there was an agreement among the stockholders of a private trading corporation that, in the event of the death of any one or more of the parties, the remaining stockholders should have the option to purchase and acquire the stock of the deceased party at its book value, which was to be ascertained by mutual agreement, but in case no agreement could be arrived at then each of the parties to have the right to appoint an arbitrator with power to select an umpire and thus fix the price of the stock, the surviving party to have the right to take or refuse the stock at the price so determined. Plaintiffs notified the administrator of their desire to purchase the stock of one of the deceased stockholders but were unable to agree on the price. Thereupon plaintiff made demand upon the administrator to appoint his arbitrator. This the administrator refused to do and plaintiffs filed a bill in equity against the administrator to compel specific performance. The court below sustained a demurrer to the bill on the ground that the agreement to submit to arbitration was revocable, and that it appeared in the bill that the administrator had revoked it. On appeal, Mr. Justice Mitchell

held that the decree could not be sustained on that ground and said (p. 82) :

"If the administrator has revoked the submission by the decedent in his agreement that fact should be averred by answer. It does not appear on the face of the bill and therefore cannot be set up by demurrer. And even if the administrator has revoked the submission it does not follow that the court under the prayer for general relief may not go on to ascertain 'the fair price or book value of the shares,' so as to give effect to the option provided for in the agreement . . .

"There is nothing illegal in the agreement on its face as set out in the bill . . .

"Nor is the objection that the agreement is in restraint of alienation sufficient. Such agreements are quite common among partners as to their shares in the firm assets and are enforced by courts without hesitation. No reason of overruling public policy is apparent why they should not also be sustained in relation to shares of stock in what is really only a private trading corporation."

The court then held that the objection to the jurisdiction of the court below was well taken because the exclusive jurisdiction over the matter was in the orphans' court, and affirmed the dismissal of the bill on that ground. Subsequently a petition to enforce the contract was filed in the orphans' court and the proceedings thereunder are reported in Lindsay's Estate, 210 Pa. 224. It there appears that respondent raised the same questions of revocation and restraint of alienation. The Orphans' Court of Allegheny County, Hawkins, P. J., appointed an expert to fix the value of the stock and entered a decree directing the sale of the stock to petitioners at the value fixed by the expert. The administrator took no appeal but petitioners appealed on the ground that the court below, in fixing the value, improperly included goodwill. The Supreme Court held

that the goodwill was properly included but modified the decree by awarding petitioners the dividends declared prior to the decree and by adding six percent to the purchase price. From this record it would seem that Judge Hawkins, as well as the parties, regarded the questions of revocability and validity as settled by the first appeal.

Persuasive also is the language of our Supreme Court in Bashford v. West Miami Land Co., 295 Pa. 560, 567, where an arbitration clause in a contract executed before 1927 was upheld even though the arbitrators were not named therein.

Construing as we do the contract before us as distinctly one of valuation which the weight of authority never did consider as revocable or against public policy, even if the Pennsylvania cases cited are deemed not controlling, we regard it as rather late in the day to carry over to valuation agreements the outmoded restrictions that since 1927 may no longer apply even to pure agreements of arbitration. We, therefore, hold that the exception must be sustained.

In so ruling we have not omitted to give due consideration to the case of Robinson v. Lumbermen's Mutual Casualty Co., 110 Pa. Superior Ct. 396, pressed upon us by the able counsel for accountants. That case held a provision of an insurance policy, required by The Insurance Company Law of May 17, 1921, P. L. 682, sec. 623, requiring the appointment of unnamed appraisers to settle damages arising from injury or loss of insured property, revocable because it was not the kind of arbitration contemplated by the Arbitration Act of 1927. While the eminent jurist who wrote the opinion called the agreement before him an appraisal agreement, still it was clearly not an appraisement to fix price agreement such as we have in this case. We must not be confused by terminology. Perhaps the more accurate term to apply to the clause of the con-

tract before us would be "valuation agreement". Be that as it may, the difference between an agreement to settle liability on an insurance claim and a contract of sale to fix price is, upon reflection, at once real and apparent. An agreement in a contract of sale providing a reference to appraisers to' be appointed to fix the *price* or to ascertain the quantity of goods sold is clearly a valuation agreement. But an agreement to refer to third parties the question of loss or damage after a dispute arises is something else, for it may, and in most insurance cases usually does, involve the fixing of the obligation of one party and the rights of the other, which could probably be done only by hearing testimony as in arbitration cases. 8 Cornell L. Q. 53, 55, quoting Mr. Justice Coleridge in Scott v. Avery, 5 H. of L. (Eng.) 811, 10 Eng. Repr., p. 1121 notes:

"The third persons '. . . may have to consider the nature of the claim, and the proofs of it' and 'decide that which may be the very point in controversy between the parties'. . . 'for the ascertainment of the amount of liability it must often be essential to go into the principal question of liability itself, and to ascertain not only whether liability exists to any extent, but also whether it exists at all . . .' "

Interesting also is Mentz v. Armenia Fire Ins. Co., 79 Pa. 478, where the same distinction occurred to Mr. Justice Sharswood, who held an agreement to refer a dispute touching the amount of loss claimed to be due under an insurance policy as arbitral in nature and therefore revocable unless the company admitted the validity of the policy and their liability under it, and that the only question was the extent of the loss. He then said (p. 481):

"Parties may agree that when the dispute is of the character of an account involving the examination of books, and the value of a large number of things, and the extent of the damage, it shall be determined by three

men as appraisers in effect—a much more appropriate tribunal for such a controversy than a jury."

In sustaining claimant's exception we wish it understood, however, that we agree entirely with that portion of the adjudication where the learned auditing judge held that, even if the contract claimed on were upheld, it could operate only as an option to claimant to acquire the stock held by decedent at the date of the contract, viz., 59 shares.

There remains to be determined the question of procedure and what form the order of this court should take. We think no formal decree is necessary at this time since we do not apprehend the executors here will, after our judgment has become final, hesitate to either agree on a price or, failing in that, refuse to name their appraiser. After all, they are fiduciaries whose actions as such are subject to the control and supervision of this court: section 9, Orphans' Court Act of June 7, 1917, P. L. 363, and Orr's Estate, 283 Pa. 476, 479.

We deem it sufficient, therefore, at this time to sustain the exception and modify the adjudication by incorporating therein the following order, viz:

"The claim of Humbert B. Powell is allowed and the accountants are directed to proceed to carry out the decedent's contract in the manner therein specified."

As thus modified, the adjudication is now confirmed absolutely.

---

Van Dusen, P. J., dissenting.—No doubt this is an appraisement rather than an arbitration. I will not go into the difference between an appraisement and an arbitration, or discuss the so-called revocability of such agreements, for the real difficulty here seems to me to be something else which is common to both appraisements and arbitrations.

In an ordinary case there is no way of compelling the parties to choose appraisers or arbitrators. When each

party is to choose one, and the two so chosen are to choose a third, there is no way of compelling them to agree upon the third member. It is for this reason that the Arbitration Act of April 25, 1927, was enacted in this State and other States, under the terms of which the court may appoint an arbitrator on behalf of a party who refuses to make a choice, and also may appoint an umpire if necessary. This statute does not apply to appraisers: Matter of Fletcher, 237 N. Y. 440; Grote v. Stein et ux., 99 Pa. Superior Ct. 556.

No case cited by the majority deals with a refusal to choose an arbitrator or an appraiser. In all of them the arbitrators had been chosen and had made a finding, and the case involved an attack on the method of appraisal, or something of that sort. This was the case of Grote v. Stein et ux., supra, for example. In the litigation which included the cases of Fitzsimmons v. Lindsay, 205 Pa. 79, and Lindsay's Estate, 210 Pa. 224, "assessors" were appointed by agreement, and the orphans' court, with the aid of the assessors, fixed the value of the stock, and specific performance of the contract of sale was decreed at that value.

The exception to this statement is Matter of Fletcher, supra. In that case the agreement provided for a purchase at "fair value" to be determined by appraisement. The parties each chose an appraiser, but they could not agree on the third. The court below appointed a third appraiser, deriving its authority from the Arbitration Act. The Court of Appeals held that this act did not apply, and stated that there were numerous decisions that specific performance of the agreement for appraisal could not be had, though no cases were cited.

The purpose of section 9 of the Orphans' Court Act is to give jurisdiction to the court in cases where "control" of a fiduciary is appropriate under substantive law, rather than to add to the substantive law. This executor is in no different position from that of an ordinary litigant. If we had jurisdiction to direct the

executor to appoint an appraiser, I do not think we would have jurisdiction to compel the appraiser to agree on an umpire. One who is compelled to appoint an appraiser against his will might be of the same opinion still. All the difficulties which prevent specific performance of an appraisal agreement are present here, although a fiduciary is involved.

Performance of the appraisal agreement is not to be confused with performance of the sale agreement. It was intimated in the Fletcher case that the purchaser of the stock might have the fair value thereof fixed by the court, and might have specific performance of the agreement to sell the stock at the price so fixed. Cases are cited by counsel which seem to hold the contrary. No such claim was made at the audit, and no evidence of value was offered, so that I will not go into this question further.